**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

C. V., a minor, by and
through her Guardian ad
Litem, Miguel Villegas;
R. V., a minor, by and
through his Guardian ad
Litem, Miguel Villegas;
D. V., a minor, by and
through his Guardian ad
Litem, Miguel Villegas;
ESTATE OF BERNIE
CERVANTES VILLEGAS,
     *Plaintiffs-Appellants*,

v.

CITY OF ANAHEIM, a
California municipal entity;
ANAHEIM POLICE
DEPARTMENT, a California
municipal entity; JOHN
WELTER; NICK BENNALLACK,
in place of Doe 1,
     *Defendants-Appellees*.

No. 14-55760

D.C. No.
8:12-cv-02013-CJC-AN

OPINION

Appeal from the United States District Court
for the Central District of California
Cormac J. Carney, District Judge, Presiding

Argued and Submitted March 15, 2016
Santa Ana, California

Filed May 25, 2016

Before: Raymond C. Fisher, Milan D. Smith, Jr., and
John B. Owens, Circuit Judges.

Opinion by Judge Owens

**SUMMARY**[*]

**Civil Rights**

The panel affirmed in part and reversed in part the district
court's summary judgment in favor of defendants in an action
brought under 42 U.S.C. § 1983 and state law alleging that
City of Anaheim police officers used unconstitutional deadly
force when they shot and killed Bernie Villegas, and
remanded.

The panel held that considering the facts in the light most
favorable to the nonmoving party, a reasonable juror could
find in favor of plaintiffs. The panel held that a reasonable
jury could draw the following factual conclusions: (1) the
officers, responding to a call about a suspected drug dealer
armed with a shotgun and loitering in the visitor parking area
of an apartment complex, came upon Villegas already
holding a long gun; (2) Villegas was ordered to put his hands

---

[*] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

up, and as he was complying, the officers ordered him to drop his gun; (3) without providing a warning or sufficient time to comply, or observing Villegas pointing the long gun toward the officers or making any move toward the trigger, Officer Bennallack resorted to deadly force. The panel held that viewing the facts in this light, deadly force was not objectively reasonable.

The panel nevertheless held that defendants were entitled to qualified immunity because it was not clearly established on January 7, 2012, that using deadly force in this situation, even viewed in the light most favorable to plaintiffs, would constitute excessive force under the Fourth Amendment. Accordingly, the panel affirmed the district court's grant of summary judgment on the Fourth Amendment claim.

Determining that the doctrine of qualified immunity does not shield defendants from state law claims, the panel reversed the district court's grant of summary judgment on the state law claims and remanded for further proceedings.

## COUNSEL

Federico C. Sayre (argued), Boris Treyzon, and Francis X. Flynn, Treyzon & Associates, Santa Ana, California, for Plaintiffs-Appellants.

Moses W. Johnson, IV (argued), Assistant City Attorney, and Michael R.W. Houston, City Attorney, Anaheim, California, for Defendants-Appellees.

## OPINION

OWENS, Circuit Judge:

C.V., R.V., D.V., and the estate of Bernie Villegas (Plaintiffs) appeal from the district court's order granting summary judgment in favor of the City of Anaheim, the Anaheim Police Department (APD), former Police Chief John Welter, and APD Officer Nick Bennallack (Defendants), in a lawsuit for the 2012 police shooting death of Villegas. Because triable issues of fact remain as to state law claims, we affirm in part, reverse in part, and remand.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On January 7, 2012, around 11:00 p.m., the APD received a 911 call about a suspected drug dealer, armed with a shotgun, loitering in the visitor parking area of an apartment complex. Four officers – Bennallack, Heitmann, Voorhis, and Ellis – rendezvoused on a street near the complex and planned their approach. They then moved on foot in a "diamond formation" through the carport area of the complex, with Heitmann taking point.

As the officers rounded a corner, they encountered two men, a few yards from each other and twelve to fifteen yards from the officers. Bennallack and Heitmann gave commands to "show me your hands" or "put your hands up." The first man they saw, Tristan Rosal, put his hands in the air. The second man, Villegas, was standing next to a cinderblock wall on the side of a low stairway.

The four officers' descriptions of what happened next – set out in sworn declarations and deposition testimony – were consistent in many respects, but different in others.

*Bennallack*: Bennallack saw what he believed to be a shotgun leaning against the wall next to Villegas (it turned out that it was a BB gun lacking any markings to distinguish it from a full-power long gun). In Bennallack's account, Villegas moved quickly to grab the gun near the end of its barrel with one hand and lift it about a foot off the ground. His other hand was not near the trigger area, and Villegas did not point the gun in the officers' direction. Heitmann and Bennallack gave "multiple commands" including "show me your hands," or "put your hands up," and "'drop the gun' or something similar," but Villegas did not obey. About one second after Villegas lifted the gun from the ground, without providing any warning to Villegas that he was going to shoot, Bennallack fired five times and struck Villegas, causing him to fall to the ground.

*Heitmann*: In Heitmann's account, when the officers rounded the corner, Villegas was already holding a long gun. Both his hands were around the barrel, near the tip, and the gun was pointed up with the butt on the ground. Heitmann never saw the gun leaning against the wall. He and Bennallack gave repeated commands to "show me your hands," or "put your hands up," but at some point he changed his commands to "'drop the gun,' 'let go of the gun,' or something similar." He saw Villegas "slightly" raise the gun about eight to ten inches off the ground, though it was at all times pointed upward and not in the officers' direction. Heitmann thought there was an immediate threat that Villegas would fire his weapon, and he was "milliseconds" from shooting Villegas when Bennallack fired his gun. Villegas's

"facial expression was not panicked, but calm," while Rosal's showed "fear" and "shock."

*Voorhis*: Voorhis did not have a clear view of the shooting, but saw a gun barrel pointed upward "toward the sky." It did not appear to be leaning against anything. He heard an officer say "drop the gun, drop the gun," saw the barrel of the gun move either upward or backward, then heard shots. He feared that Villegas could use the gun against the officers.

*Ellis*: Ellis also did not have a clear view of the shooting, but heard an officer yell something like "put it down," "drop it," or "get on the ground." A second later, he heard gunshots.

After the shooting, Bennallack and Heitmann approached Villegas and administered CPR until paramedics arrived. Villegas died from his wounds.

In October 2012, Plaintiffs sued Defendants in state court, bringing a 42 U.S.C. § 1983 claim for excessive force in violation of the Fourth Amendment and state law claims for negligence and wrongful death.[1] Defendants removed that suit to federal court, and moved for summary judgment. The district court concluded that summary judgment was appropriate on the Fourth Amendment claim, as "an objectively reasonable officer would reasonably believe that Mr. Villegas posed an 'immediate threat to the safety of the officers or others' – the 'most important factor' in the *Graham* [*v. Connor*, 490 U.S. 386 (1989)] excessive force

---

[1] On appeal, Plaintiffs have abandoned their Fourteenth Amendment substantive due process claim, so we do not address it.

analysis," and that it would "not judge the reasonableness of Officer Bennallack's actions with the 20/20 vision of hindsight." Alternatively, the district court held that Bennallack was entitled to qualified immunity because it was not clearly established that his conduct violated the Fourth Amendment. The district court also granted summary judgment on the state law claims because it found Officer Bennallack's conduct was objectively reasonable. This appeal followed.

## II. STANDARD OF REVIEW

We review de novo a district court's grant of summary judgment. *Glenn v. Washington County*, 673 F.3d 864, 870 (9th Cir. 2011). We also review de novo a defendant officer's entitlement to qualified immunity. *Id.*

## III. ANALYSIS

### A. Fourth Amendment Claim

"In determining whether an officer is entitled to qualified immunity, we consider (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). While we have discretion to decide which prong to address first, here we address both. *Id.*

*Graham* provides the framework for reviewing excessive force claims. Its non-exhaustive list of factors for evaluating reasonableness include: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the

safety of the officers or others; and (3) whether the suspect actively resisted arrest or attempted to escape. *Graham*, 490 U.S. at 396; *see also George v. Morris*, 736 F.3d 829, 837–38 (9th Cir. 2013) (discussing *Graham* and *Tennessee v. Garner*, 471 U.S. 1 (1985)). We must judge the reasonableness of a particular use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Graham*, 490 U.S. at 396, keeping in mind that the "'most important' factor under *Graham* is whether the suspect posed an 'immediate threat to the safety of the officers or others,'" *George*, 736 F.3d at 838 (internal quotation marks omitted) (quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)). "[S]ummary judgment should be granted sparingly in excessive force cases. This principle applies with particular force where the only witness other than the officers was killed during the encounter." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014) (en banc) (citation omitted).[2]

Considering the facts in the light most favorable to the nonmoving party, *Glenn*, 673 F.3d at 870, a reasonable juror could find in favor of Plaintiffs. While the officers' testimony is largely consistent – Villegas held what resembled a shotgun, and did not put it down when ordered to do so – the officers' sworn declarations and testimony differ on key points. Bennallack testified that merely one second before he shot Villegas, he observed Villegas make "a quick movement" to grab the barrel of the rifle which had previously been resting against the wall. If this were undisputed, then summary judgment might be appropriate: "If the person is armed . . . [then] a furtive movement, harrowing

---

[2] Rosal was unavailable as a witness, as he apparently left the United States for the Philippines.

gesture, or serious verbal threat might create an immediate threat." *George*, 736 F.3d at 838.

But that is not what other officers saw. Heitmann did not see Villegas grab the gun from against the wall, as Bennallack testified, but rather observed Villegas already holding the gun. Voorhis also testified he believed Villegas was holding the gun and it did not appear to be leaning against anything. Heitmann recalled Villegas's calm expression as he "slightly" raised the gun from the ground. And none of the officers provided a clear time line of when they switched from ordering Villegas to raise his arms to ordering him to drop the gun, or how long after that switch Villegas had to comply with the new command before Bennallack opened fire. This is particularly important because, viewed in the light most favorable to Plaintiffs, Heitmann's description of Villegas's movement is consistent with Villegas complying with the order to put his arms up: "The butt of the stock was on the ground or close to it, and as [Villegas] moved his arms, the rifle was moving with him, in an upward manner." Applying the *Graham* factors, the first and third factors fall in Plaintiffs' favor, and the second factor is less than clear.

On summary judgment, "all justifiable inferences are to be drawn in [Villegas's] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A reasonable jury could draw the following factual conclusions: (1) the officers, responding to a call about a suspected drug dealer armed with a shotgun and loitering in the visitor parking area of an apartment

complex, came upon Villegas already holding a long gun;[3] (2) Villegas was ordered to put his hands up, and as he was complying, the officers ordered him to drop his gun; (3) without providing a warning or sufficient time to comply, or observing Villegas pointing the long gun toward the officers or making any move toward the trigger, Bennallack resorted to deadly force. Viewing the facts in this light, deadly force was not objectively reasonable. Thus, the district court erred in holding that Bennallack's use of deadly force was justified as a matter of law and in granting summary judgment on that basis. Our court has rejected summary judgment in cases involving similar degrees of apparent danger, and we must do the same here.[4]

That ruling does not end our inquiry. Under the second prong of the qualified immunity test, we ask whether the

---

[3] At argument, counsel for Defendants reasoned that the officers' formation and the apartment complex layout led to the inconsistencies among the four officers' sworn declarations and testimony, and that Bennallack's perspective provided the most accurate account for what occurred. That may be true. But whether it is true is a quintessential jury question, as "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255.

[4] *See, e.g.*, *Gonzalez*, 747 F.3d at 793–98 (reversing the district court's grant of summary judgment on excessive force claim where officer shot driver of a minivan after driver accelerated vehicle with officer inside and refused commands to stop); *Glenn*, 673 F.3d at 871–78 (reversing the district court's grant of summary judgment on excessive force claim where officers shot and killed individual who did not comply with orders to put down a knife for approximately three minutes); *George*, 736 F.3d at 837–39 (affirming the district court's denial of summary judgment on excessive force claim where officer shot and killed an armed individual and there were triable issues as to whether the individual had the gun "trained on the ground").

alleged violation of Villegas's Fourth Amendment right against excessive force "was clearly established at the time of the officer's alleged misconduct." *Lal*, 746 F.3d at 1116. If not, the officer receives qualified immunity. "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (alteration in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "We do not require a case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate." *Id.*; *see also Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) (explaining that the qualified immunity inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition" (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001))).

We agree with the district court that it was not clearly established on January 7, 2012, that using deadly force in this situation, even viewed in the light most favorable to Plaintiffs, would constitute excessive force under the Fourth Amendment.[5] Bennallack is therefore immune from liability

---

[5] *Cf.*, *Brosseau*, 543 U.S. at 200–01 (holding that officer was entitled to qualified immunity where the cases relied on by plaintiffs did not "squarely govern[]" the constitutionality of shooting a "disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area [were] at risk from that flight"); *Blanford v. Sacramento County*, 406 F.3d 1110, 1119 (9th Cir. 2005) (holding that deputies were entitled to qualified immunity because they "would not have found fair warning in *Garner*, *Graham*, or any other Supreme Court or circuit precedent at the time that they could not use deadly force to prevent someone with an edged sword, which they had repeatedly commanded

under section 1983 for his use of deadly force, so we affirm the grant of summary judgment on the Fourth Amendment claim.

## B. State Law Claims

"[T]he doctrine of qualified immunity does not shield defendants from state law claims." *Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1171 (9th Cir. 2013); *see also Cousins v. Lockyer*, 568 F.3d 1063, 1072 (9th Cir. 2009) ("California law is clear that the doctrine of qualified governmental immunity is a federal doctrine that does not extend to state tort claims against government employees" (citations, alterations, and internal quotation marks omitted)). Because we conclude that the district court erred in holding that the use of deadly force was objectively reasonable as a matter of law, we reverse the district court's grant of summary judgment on the state law claims and remand them for further proceedings.[6]

## AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

The parties shall bear their own costs on appeal.

---

him to drop and whom they had repeatedly warned would otherwise be shot, from accessing a private residence where they or people in the house or yard might be seriously harmed").

[6] As to the negligence claim, we note that the California Supreme Court has clarified that "state negligence law . . . is broader than federal Fourth Amendment law." *Hayes v. County of San Diego*, 305 P.3d 252, 263 (Cal. 2013).