FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHRISTIAN LONGORIA, a single man, on behalf of himself as son of decedent Manuel O. Longoria, on behalf of all statutory beneficiaries of decedent Manuel O. Longoria; JOSHUA R. WALLACE, as the personal representative of the Estate of Manuel O. Longoria; MANUEL LONGORIA, JR., a single man; LYNNETTE LONGORIA, a single woman; P. C. L., a minor, T. A. L., a minor; K. R. L., a minor; SANISYA LOTT, a single woman; T. L., a minor; and A. L., a minor,
                    *Plaintiffs-Appellants*,

v.

PINAL COUNTY, a political subdivision of the State of Arizona; PAUL R. BABEU, in his official capacity as Sheriff of Pinal County, Arizona; and HEATH RANKIN, in his individual capacity as a Deputy Sheriff of Pinal County, Arizona,
                    *Defendants-Appellees*.

No. 16-15606

D.C. No.
2:15-cv-00043-SRB

OPINION

Appeal from the United States District Court
for the District of Arizona
Susan R. Bolton, District Judge, Presiding

Argued and Submitted June 6, 2017
Pasadena, California

Filed October 10, 2017

Before: Stephen Reinhardt and Alex Kozinski, Circuit
Judges, and Terrence Berg,[*] District Judge.

Opinion by Judge Reinhardt

**SUMMARY**[**]

**Civil Rights**

The panel reversed the district court's grant of qualified
immunity on summary judgment in favor of Pinal County
Deputy Sheriff Heath Rankin and affirmed the dismissal of
claims brought by family members in a 42 U.S.C. § 1983
action alleging that Rankin used excessive deadly force
when he shot Manuel Longoria in the back and killed him
following a car chase.

---

[*] The Honorable Terrence Berg, United States District Judge for the
Eastern District of Michigan, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It
has been prepared by court staff for the convenience of the reader.

The panel stated that it was required to assess Rankin's reasonableness in using deadly force against Longoria, who was unarmed, was surrounded by law enforcement officers, had been shot by bean bag rounds and a taser, and was in the process of putting his hands over his head reflexively or in an effort to surrender. Rankin alleged that when Longoria turned to raise his hands he threatened him or his fellow officers with a "shooter's stance." The panel held that because of the many material, disputed facts in this case, Rankin's credibility or the accuracy of his version of the facts was a central question that had to be answered by a jury. Because there was a material issue of fact as to whether Rankin violated Longoria's clearly established constitutional right, defendants were not entitled to qualified immunity. The panel therefore reversed the district court's grant of summary judgment and remanded for a jury to determine whether Rankin's use of deadly force was lawful.

The panel affirmed the district court's dismissal of Longoria's family-members' § 1983 claims. The panel held that only Longoria's estate could bring a § 1983 for the violation of his Fourth Amendment rights; his family members had no standing to sue on their own behalves.

The panel reversed the district court's grant of summary judgment on plaintiffs' wrongful-death claim brought under Arizona Revised Statute § 12-611. The panel held that summary judgment was not appropriate because there was a material dispute of facts as to whether or not Rankin's use of deadly force was reasonable.

## COUNSEL

Joel B. Robbins (argued), Robbins & Curtin PLLC, Phoenix, Arizona; Joseph M. Leal III, Cole & Leal, Casa Grande, Arizona; Darius Bursh, McCain & Bursh PLC, Scottsdale, Arizona; for Plaintiffs-Appellants.

Nicholas D. Acedo (argued) and Kathleen L. Wieneke, Struck Wieneke & Love P.L.C., Chandler, Arizona, for Defendants-Appellees.

## OPINION

REINHARDT, Circuit Judge:

Pinal County Deputy Sheriff Heath Rankin fired two shots into Manuel Longoria's back and killed him just as he was raising his hands above his head. Rankin's shots followed the use of non-lethal force by police officers from the City of Eloy who were charged with arresting Longoria.

When Longoria's estate (hereinafter "Longoria") sued Rankin under § 1983, the district court held that Rankin was entitled to qualified immunity and entered summary judgment in his favor. We reverse and remand for further proceedings.[1]

## BACKGROUND

Distraught over his relationship with the mother of three of his children, Manuel Longoria stole his brother-in-law's car and began driving around the city of Eloy, Arizona. Eloy

---

[1] We discuss infra the remainder of the action filed by Plaintiffs.

police officers saw him and initiated a traffic stop, but Longoria fled and led officers on a chase that lasted for more than 70 minutes.

The Eloy Police Department ("EPD") asked the Pinal County Sheriff's Office ("PCSO") to be on "standby" in case Longoria left Eloy's jurisdiction. PCSO informed its officers that Longoria was driving a stolen vehicle and (mistakenly) that he was armed. PCSO Deputy Heath Rankin and his partner, Deputy J. Rice, joined the pursuit and participated for more than 40 minutes.

During the chase, Longoria stopped his vehicle and spoke with the pursuing officers several times, but continued to ignore commands to surrender. During one of these stops, Longoria got out of the car and was seen holding and kissing purple or dark-colored rosary beads which he held in his hand. During another, he got out of the car for a brief period and held his wallet behind his back. EPD Detective Salazar saw that Longoria was holding a wallet, not a gun, behind his back and shouted this out to the other officers on the scene. That information was also dispatched on an EPD radio frequency that Rankin was monitoring. Rankin maintains that he did not hear that part of the broadcast.

Longoria exhibited other erratic behavior. He threw money and various objects out of the vehicle while driving and told officers that he had nothing to live for and wanted to die. Longoria asked officers to give his money to his family members, and at times even joked with officers pursuing him that they would scratch their vehicles if they kept pulling so close to him. While driving, he waved his hand out of the car, sometimes making a gun with his fingers and pointing his fingers at his head as though gesturing for officers to shoot him. EPD Officer Dean reported over the radio that Longoria was simulating a gun with his fingers.

As Longoria continued to drive, onlookers gathered and he laughed, pointed, waved, and even flashed a peace sign at civilians on the streets.

Shortly before the chase ended, Pinal County Lieutenant Villegas ordered Rankin and other Pinal County deputies to stand down from the pursuit. Rankin heard this command and initially followed it. Rankin's Sergeant then directed him to form a perimeter at the intersection of Main and Battaglia Streets, which he did.

A few minutes later, Eloy police officers halted the chase by disabling Longoria's car with a PIT maneuver.[2] Rankin was standing around the corner about a half-block away. After hearing the crash, he abandoned the perimeter, grabbed his assault rifle, and ran towards the scene, followed by his partner Rice.[3]

While Rankin was sprinting to the scene, Longoria got out of his vehicle and stood facing the Eloy officers with one hand behind his back near the car. Eight officers surrounded him and drew their guns. Longoria initially did not comply with police commands to show his hands. Eloy Sergeant Tarrango shouted for officers to use "less lethal," or less than lethal, force at least twice. Other Eloy officers shouted that

---

[2] A PIT (Pursuit Intervention Technique) maneuver is a method of forcing a fleeing car to abruptly turn sideways, which causes the driver to lose control and stop. It involves officers using a patrol car to veer into the rear half of either the driver's side or passenger's side of a suspect's car.

[3] Rankin asserts that the order to form a perimeter meant that he was to actively assist with getting Longoria into custody if and when the chase ended. No PCSO officers other than Rice abandoned the perimeter and followed Rankin in his pursuit of Longoria.

Longoria had only a wallet behind his back. Still more shouted to tase Longoria.

Rankin ran behind Longoria—across what would have been the line of fire had the Eloy officers needed to shoot— and joined the other officers near the point of collision. Rankin asserts that he did not hear the commands to use less than lethal force while he was running towards the collision.

Rankin stopped running and took up a position between 25 to 45 feet to Longoria's right, to the side and further away from Longoria than all of the other officers who had their weapons drawn. Longoria was facing the other officers, and continued to stand with one hand behind his back near his disabled car. Shortly after Rankin stopped sprinting, some of the other officers fired beanbag rounds at Longoria, striking him. An officer tased him, hitting him with one dart. Longoria flinched and moved erratically. He then turned halfway around to his right—towards and past Rankin—to face his car and put his empty hands up above his head, his back to the officers and Rankin. Rankin fired two rounds from his assault rifle into Longoria's back, killing him.

The § 1983 suit ensued, as did the district court's grant of summary judgment on the ground of qualified immunity.

## STANDARD OF REVIEW

We review a district court's grant of summary judgment and qualified immunity *de novo*. *Hughes v. Kisela*, 862 F.3d 775, 779 (9th Cir. 2016).

## DISCUSSION

### I.   Qualified Immunity

Longoria challenges the district court's entry of summary judgment in favor of Rankin on the ground of qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). Qualified immunity exists to shield an officer from liability for "mere mistakes in judgment, whether the mistake is one of fact or one of law." *Butz v. Economou*, 438 U.S. 478, 507 (1978). The doctrine's purpose is to strike a balance between the competing "need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. "In determining whether an officer is entitled to qualified immunity, we consider (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014).

"Consequently, at summary judgment, an officer may be denied qualified immunity in a Section 1983 action 'only if (1) the facts alleged, taken in the light most favorable to the party asserting injury, show that the officer's conduct violated a constitutional right, and (2) the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood [his] conduct to be unlawful in that situation.'" *Hughes*, 862 F.3d at 783

(quoting *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011)). Our analysis must be from the perspective of a "reasonable officer on the scene" and "allo[w] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014) (quoting *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)).

We acknowledge at the outset that in the last five years, the Supreme Court has reversed a number of federal courts, including ours, in qualified immunity cases because we failed to abide by the longstanding principle that "'clearly established law' should not be defined at a high level of generality." *White v. Pauly*, 137 S. Ct. 548, 551–552 (2017) (per curiam). This has been a particular problem in cases presenting novel factual circumstances involving car chases. Here, although preceded by a car chase, the shooting occurred after the pursuit ended and Longoria's vehicle was disabled, as described above. This is not one of those cases occurring mid-pursuit against a "hazy legal backdrop." *See Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015) (per curiam) (discussing the factual circumstances in *Plumhoff*, 134 S. Ct. at 2012; *Scott v. Harris*, 550 U.S. 372 (2007); *Brosseau v. Haugen*, 543 U.S. 194 (2004) (per curiam)). Nor is this like other recent cases the Court has reversed. We do not rely on a factor mentioned in prior case law but not clearly established such that a reasonable officer would be on notice to conform his conduct accordingly, *see, e.g.*, *White*, 137 S. Ct. at 552, or define a constitutional violation at too high a level of generality to be clearly established, *see, e.g.*, *Mullenix*, 136 S. Ct. at 308–09.

Here we must assess Rankin's reasonableness in using deadly force against Longoria, who was unarmed, was surrounded by law enforcement officers, had been shot by bean bag rounds and a taser, and was in the process of putting his hands over his head reflexively or in an effort to surrender. Rankin claims that when Longoria turned to raise his hands he threatened him or his fellow officers with a "shooter's stance." Because of the many material, disputed facts in this case, Rankin's credibility or the accuracy of his version of the facts is a central question that must be answered by a jury. We cannot decide as a matter of law that qualified immunity is appropriate at the summary judgment phase.

## A.  Constitutional Violation

Plaintiffs argue that Rankin violated Longoria's Fourth Amendment rights when he used excessive force to shoot Longoria dead. We must evaluate such a claim through the Fourth Amendment's reasonableness standard, considering "whether the officers' actions [we]re 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham*, 490 U.S. at 397. In our analysis, we weigh the "nature and quality of the intrusion" against the "countervailing governmental interests at stake." *Id.* at 396.

"The intrusiveness of a seizure by means of deadly force is unmatched." *Tennessee v. Garner*, 471 U.S. 1, 9, (1985). Rankin deprived Longoria of the "fundamental interest in his own life." *Id.*

"The strength of the government's interest in the force used is evaluated by examining three primary factors: (1) 'the severity of the crime at issue,' (2) 'whether the suspect poses an immediate threat to the safety of the officers

or others,' and (3) 'whether []he is actively resisting arrest or attempting to evade arrest by flight.'" *Hughes*, 862 F.3d at 779 (quoting *Graham*, 490 U.S. at 396). The second factor is the most important, but we are not limited to these three; rather, we must consider the "totality of the circumstances." *Id.* Here the district court made impermissible factual inferences in favor of Rankin in its analysis of the second factor as well as other factual circumstances.

The "most important" factor is whether Longoria posed an *immediate* threat. *Id.* Rankin shot Longoria after the car chase had ended. Longoria's car was fully immobilized; he was surrounded by armed officers, and his erratic driving no longer posed any threat to bystanders. He had been hit by several bean bag rounds shot from close range as well as a taser dart. Viewing the circumstances in the light most favorable to Longoria, the inquiry is thus whether he posed an immediate threat to Rankin or the many officers around him, or whether a reasonable officer would have perceived Longoria to be an immediate threat, after the non-lethal force was used but before Rankin shot him dead.

We are aided in our reasonableness analysis by two videos of the moments right before Longoria's death, one from a dashboard camera of an EPD cruiser and the other from a bystander's iPhone video recorded from over 200 feet away. Viewed in real-time, as officers—including Rankin— would have experienced the event,[4] the videos depict

---

[4] Neither party asserts that the videos portray the events from Rankin's exact perspective when he fired his weapon. They were taken from locations different from where Rankin stood. His precise position and perspective is an additional fact that would be relevant to a rational jury in finding the facts, but it remains unclear based on the varying accounts from Rankin, Rice, other officers, and the location of the casings from Rankin's rifle precisely what Rankin saw. The one thing

Longoria flailing his arms and moving erratically before turning around and raising his empty hands above his head in the several seconds before Rankin shoots and kills him. Defendants argue that Rankin reasonably perceived a black or silver weapon in Longoria's hands and then saw Longoria assume a "shooter's stance." The district court relies on a single frozen frame from one of the videos to find that "uncontroverted video evidence shows that Mr. Longoria came up with both hands in front of him facing Defendant Rankin's direction." It does not mention any black or silver weapon.

Deputy Rankin did not however see a frozen frame, disaggregated from the context of the rest of the footage. He watched events unfold in real-time as the two videos played at their ordinary speed portray. These videos provide some of the most important evidence as to what occurred before and during the shooting and what Rankin actually saw. This evidence alone raises material questions of fact about the reasonableness of Rankin's actions and the credibility of his post-hoc justification of his conduct. *See Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1177 n.7 (9th Cir. 2013) (observing that a video, even when an imperfect account of an officer's perspective, is relevant to his credibility). Viewing the two videos in the light most favorable to Longoria, the moment Rankin describes as a "shooter's stance" is not perceptible. While Rankin relies on a single frozen frame of the iPhone video to illustrate the "shooter's stance," all that demonstrates is the existence of a

---

we do know is that he saw the events in real-time, just as the two videos recorded them, not as they were depicted in a frozen frame.

genuine dispute of material fact.[5] The full record only heightens this and other factual disputes.

The most important question in this case is whether Rankin reasonably perceived that Longoria assumed a threatening or "shooter's stance." "If [he] did, [he] w[as] entitled to shoot; if [he] didn't, [he] [was]n't." *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014) (explaining

---

[5] Using frozen frames to bolster the perspective of law enforcement is not a new phenomenon. Twenty-five years ago in the 1992 Simi Valley state court trial of the officers who beat Rodney King:

> Frame-by-frame stills of the video were mounted on clean white illustration boards and then used as the basis for questions to "experts" on prisoner restraint. Each micro-moment of the beating of King was broken down into a series of frozen images. As to each one, the defense attorneys asked the experts whether King assumed a compliant posture, or might a police officer reasonably conclude that King still posed a threat to resist. Once the defense broke the video into frames, each still could then be re-weaved into a different narrative about the restraint of King. Each blow to King represented, not [a] beating . . . but a police approved technique of restraint complete with technical names for each baton strike (or "stroke").

Kimberle Crenshaw and Gary Peller, *Reel Time/Real Justice*, 70 Denv. U. L. Rev. 283, 285 (1993).

The state court jury acquitted the officers. *See id.* at 290. Subsequently, in a federal court trial for the violation of King's federal civil rights, the federal jury convicted two of the four officers charged. *See Koon v. United States*, 518 U.S. 81, 88 (1996). These inconsistent results demonstrate why the probative value of real-time videos and frozen frames is more appropriately a matter for a jury to view and evaluate, not a matter for a court to resolve on summary judgment.

that a case in which multiple officers shot an unarmed man turned on whether or not officers perceived the suspect reach for a gun in his waistband). In *Cruz*, four officers testified that the decedent reached for a weapon in his waistband, but we nevertheless reversed the district court's grant of summary judgment because circumstantial evidence cast doubt upon the officers' credibility. *Id.* at 1078–80. Here, the evidence supporting Rankin's version of events is even slimmer. *No other officers* saw Longoria assume a "shooter's stance" and responded accordingly. In fact, the Eloy officer who Defendant argues can be seen in the cell phone footage visibly "ducking" in response to the "shooter's stance" stated that he cannot remember responding in such a manner to such a threat. Instead, other officers gave statements that it appeared that at the time Rankin killed him, Longoria was moving towards his car after being shot by non-lethal rounds, flailing in response to the impact of the bean bags and taser, or moving his hands to his chest as if checking whether he had been shot. Longoria's expert in police practices could not discern Longoria assuming a "shooter's stance" from the iPhone video reviewed in real-time.[6] The material dispute over these facts alone is enough to deny summary judgment. *See Lopez v. Gelhaus*, No. 16-15175, slip op. at 26, 28 (9th Cir. Sept. 22, 2017) (affirming denial of qualified immunity where officers gave differing accounts as to whether decedent

---

[6] "We have held en banc that '[a] rational jury could rely upon such [expert] evidence in assessing whether the officers' use of force was unreasonable.'" *Glenn v. Washington County*, 673 F.3d 864, 877 (9th Cir. 2011) (quoting *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (en banc) (reversing district court's grant of summary judgment)). Here, although the expert's report is far from clear, we view it in the light most favorable to Longoria. Moreover, here as in *Lopez*, both sides had experts who disagreed as to whether the officer could have perceived the alleged threatening gesture. *Lopez*, slip op. at 8, 19.

turned towards them and what turned out to be a toy weapon resembling an AK-47 appeared to be rising and pointing towards them).

The record reveals many other facts in dispute that are material to the determination of whether a reasonable officer would have perceived that Longoria posed any immediate threat. The real-time videos highlight these competing inferences rather than "blatantly contradict[ing]" or "utterly discredit[ing]" Longoria's version of events. *See Scott*, 550 U.S. at 380–381. In addition to the question whether Rankin actually perceived that Longoria assumed a "shooter's stance" when he shot and killed him, there is, inter alia, a material dispute as to: whether Rankin heard commands to use non-lethal force or the other officers' shouts that Longoria was holding his wallet behind his back; whether Rankin, who has 20/20 vision, reasonably perceived a weapon in Longoria's hands from his position as he said he did; whether Longoria was in fact reacting to the non-lethal force deployed by other officers rather than assuming a "shooter's stance"; and whether, as a matter of fact, Rankin could have had enough time to perceive the alleged "shooter's stance" at the moment he claims to have done so and then shoot Longoria in response to that observation at the time the videos show he shot him.[7] The district court resolved all of those disputed facts in favor of Rankin. Viewing all of these facts in the light most favorable to Longoria, a reasonable jury could conclude that Rankin knew or should have known that Longoria was not armed,

---

[7] There is also a question of fact as to whether, even if Rankin did perceive a "shooter's stance," Longoria's abandoning of that stance and his turning and raising his hands happened so quickly thereafter that a reasonable officer would not have had enough time to shoot before knowing that he should hold his fire.

that Rankin never perceived a "shooter's stance," and that Rankin knew or should have known that Longoria was either surrendering in response to the non-lethal force of the bean bag rounds and taser or reacting in some manner to their effects upon him but was by no means threatening to shoot at Rankin or any of the other officers.

When a suspect is killed and cannot himself provide an account of what took place, we must examine "whether the officers' accounts are 'consistent with other known facts.'" *Cruz*, 765 F.3d at 1080 n.3 (citation omitted); *see also Newmaker v. City of Fortuna*, 842 F.3d 1108, 1116 (9th Cir. 2016). This is consistent with our duty to review the record "from the perspective of a *reasonable* officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (emphasis added). Rankin's assertion that he perceived a "shooter's stance" is refuted by the two real-time videos, other officers' accounts, Longoria's expert, and most notably, Rice, his partner who ran to the scene of the collision behind him and had an almost identical perspective. Rice "observed the suspect reach behind his back and it appeared he was attempting to return inside the vehicle."[8] We may consider the conflicting accounts of Rice and other officers—none of whom related that they saw Longoria assume a "shooter's stance"—in assessing Rankin's claim of reasonableness, as well as circumstantial evidence, like the

---

[8] Rankin's account of interactions with Longoria differs from Rice's in other ways. For example, Rankin alleges that Longoria pointed something that appeared to be a gun at him out of the car window while driving earlier in the pursuit. Rice, like other officers observing these repeated gestures, observed that "the suspect driver . . . plac[ed] his left hand out the window making the shape of a handgun with his thumb and pointer finger." Rankin also asserts that Longoria threatened him directly during this interaction; Rice, who sat next to him in the vehicle, reported no such threat.

fact that Longoria was actually unarmed. A reasonable jury is far less likely to credit Rankin's perception of a "shooter's stance" with the knowledge that Longoria did not have a gun. *See Cruz*, 765 F.3d at 1079 ("In this case, there's circumstantial evidence that could give a reasonable jury pause. Most obvious is the fact that Cruz didn't have a gun on him, so why would he have reached for his waistband? . . . [F]or him to make such a gesture when no gun is there makes no sense whatsoever.").

In assessing the reasonableness of the use of force, we must consider the "totality of the circumstances." *Glenn*, 673 F.3d at 871 (citation omitted). It is undisputed that Longoria was emotionally disturbed, acting out, and at times inviting officers to use deadly force to subdue him. *See Hughes*, 862 F.3d at 781. Our precedent establishes that in these circumstances, a reasonable jury could conclude "that there were sufficient indications of mental illness to diminish the governmental interest in using deadly force." *Id.* Other officers appear to have been aware of this and prepared to respond accordingly by employing only non-lethal weapons. And like many other similarly tragic encounters with mentally ill or emotionally disturbed individuals, the situation facing Rankin was "far from that of a lone police officer suddenly confronted by a dangerous armed felon threatening immediate violence." *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001). Rankin had an opportunity to observe Longoria for more than forty minutes before he killed him. *See id.* During that time, Longoria neither brandished a gun nor shot at anyone.

Another circumstance to be considered is that Rankin was monitoring the EPD and PCSO radio frequencies throughout the incident. Despite this, Rankin claims he did not hear portions of the police broadcast earlier in the pursuit

that conveyed Longoria was unarmed, nor did he hear the commands to use less than lethal force and the shouts that Longoria was unarmed in the seconds before the shooting. Viewing the facts in the light most favorable to Longoria, Rankin disobeyed orders to maintain a perimeter and sprinted towards the scene—through the line of fire. Rankin knew that other officers were in better positions to see and respond to Longoria, had their weapons drawn, and were in the process of using non-lethal force. The totality of circumstances does not support the conclusion that Rankin's conduct was objectively reasonable. Rather it raises a genuine issue of material fact to be determined by a jury.

The immediacy of the threat and Rankin's objective reasonableness in the totality of the circumstances depend upon the resolution of disputes of material facts that must be resolved against Rankin at this stage of the proceedings. We cannot say as a matter of law that Rankin acted reasonably. The question of whether a constitutional violation occurred is therefore a matter for the jury to determine.

## B.  Clearly Established Right

We next proceed to the second question in assessing qualified immunity: whether the right at issue was clearly established. "The 'dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Hernandez v. Mesa*, 137 S. Ct. 2003, 2008 (2017) (per curiam) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). Our analysis "is limited to 'the facts that were knowable to the defendant officers' at the time they engaged in the conduct in question." *Id.* (quoting *White*, 137 S. Ct. at 550). Because we are making a determination at summary judgment, we must view any disputed facts in the light most favorable to Longoria.

To determine whether the law was clearly established, we do not "require a case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). We have acknowledged that qualified immunity may be denied in novel circumstances. *See Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir. 2011) (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). "Otherwise, officers would escape responsibility for the most egregious forms of conduct simply because there was no case on all fours prohibiting that particular manifestation of unconstitutional conduct." *Deorle*, 272 F.3d at 1286; *see also Brosseau*, 543 U.S. at 199 (stating that "in an obvious case, [general] standards can 'clearly establish' the answer, even without a body of relevant case law").

The law governing this case is clearly established: "A police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Garner*, 471 U.S. at 11.

> While locating the outer contours of the Fourth Amendment may at times be a murky business, few things in our case law are as clearly established as the principle that an officer may not "seize an unarmed, nondangerous suspect by shooting him dead" in the absence of "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others."

*Torres*, 648 F.3d at 1128 (quoting *Garner*, 471 U.S. at 11); *see also Adams v. Spears*, 473 F.3d 989, 994 (9th Cir. 2007). Thus, Longoria's Fourth Amendment right not to be shot dead while unarmed, surrounded by law enforcement, and in the process of surrendering is clearly established such that a

"it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."**[9]** *Hernandez*, 137 S. Ct. at 2008. If, however, Rankin reasonably perceived that Longoria posed a threat of serious physical harm to Rankin or other officers, then he could have lawfully used deadly force. There is no dispute in this case about these propositions.

We are presented here with a pure question of fact and not a question of law or of mixed fact and law. Rankin contends that he in fact perceived that Longoria assumed a "shooter's stance" and that Longoria appeared to be armed. Longoria, on the other hand, asserts that Rankin did not see, nor could he in fact have seen, what he claimed caused him to believe that Longoria assumed a "shooter's stance" and that he appeared to be armed.

"Where the facts are disputed, their resolution and determinations of credibility 'are manifestly the province of a jury.'" *Wall v. County of Orange*, 364 F.3d 1107, 1110 (9th Cir. 2004) (quoting *Santos*, 287 F.3d at 852). This case turns on disputed facts, including the credibility of Rankin. Rankin's account of an earlier interaction with Longoria during the car pursuit is inconsistent with that of his partner, Rice. Rankin heard some information on the radio dispatches of both the EPD and the PSCO, but he claims not to have heard any of the information relayed over those radio frequencies that would be helpful to Longoria. Unlike other PCSO officers, Rankin interpreted the command to maintain a perimeter as a command to run towards Longoria and the

---

**[9]** Within the specific context of Longoria's death, shot with his empty hands in the air above his head, this constitutional right is so clearly established that it has become the anthem in many protests of other police shootings: "Hands up, don't shoot!"

Eloy officers after a PIT maneuver totally disabled Longoria's car. Rankin likewise asserts that he did not hear any of the commands to use non-lethal force immediately prior to the shooting, nor did he hear officers shouting that Longoria was unarmed. This is inconsistent with the accounts of many other officers on the scene. Most important, *no one else* saw Longoria assume a "shooter's stance," including Rice, who was just behind him at the time. The two videos show that anyone who saw the events in real-time, including Rankin, would not have seen Longoria adopt what would have appeared to be a "shooter's stance."

A jury must determine Rankin's credibility in light of conflicting accounts from his partner, other officers, Longoria's expert, and the videos in real-time. *See Cruz*, 765 F.3d at 1080 ("We make no determination about the officers' credibility, because that's not our determination to make. We leave it to the jury."). If a jury concluded that Rankin reasonably perceived Longoria to be armed and threatening, it could find he had reason to use deadly force and thus there was no violation of Longoria's clearly established constitutional right. *See Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993) ("[T]he facts and circumstances within an officer's knowledge . . . are matters of fact to be determined, where genuine disputes of a material nature exist, by the fact finder."). However, a reasonable jury could also conclude that Rankin knew or should have known that Longoria was not holding a gun and that he did not assume a "shooter's stance" and could find that Rankin's statements to the contrary were not credible. A jury resolving these questions in Longoria's favor could thus find that Rankin violated Longoria's clearly established right. We may not usurp the jury's role as the arbiters of fact, nor can our analysis at summary judgment change simply because the videos that show these disputed events unfolding

in real-time may be called into question by a single frozen frame that does not represent what an officer actually saw at the time the events unfolded. *See Lopez*, slip op. at 45 (finding that a jury must determine the facts relevant to qualified immunity: whether the officer could have reasonably perceived the decedent turning while holding a toy AK-47 as a "harrowing gesture").

Defendants are not entitled to qualified immunity because there is a material issue of fact as to whether Rankin violated Longoria's clearly established constitutional right. We therefore reverse the district court's grant of summary judgment and remand for a jury to determine whether Rankin's use of deadly force was lawful.

## II.  Plaintiffs' Rule 56(d) Motion

Plaintiffs challenge the denial of their Rule 56(d) motion. This challenge is moot because on remand the parties will be entitled to conduct further discovery.

## III. Family-Member Plaintiffs' § 1983 Claims

Longoria challenges the dismissal of the family-member Plaintiffs' § 1983 claims. Only Longoria's estate may bring a § 1983 for the violation of his Fourth Amendment rights; his family members have no standing to sue on their own behalves. The Supreme Court has made this abundantly clear. *Alderman v. United States,* 394 U.S. 165, 174 (1969) ("Fourth Amendment rights are personal rights which . . . may not be vicariously asserted."). Moreover, the Court has recently reaffirmed this principle. *Plumhoff*, 134 S. Ct. at 2022 ("Our cases make it clear that Fourth Amendment rights are personal rights which may not be vicariously asserted.") (citations omitted). We therefore affirm the

district court's dismissal of the family-members' § 1983 claims.

## IV. State Wrongful Death Claim

Plaintiffs brought a wrongful-death claim under Arizona Revised Statute § 12-611 against Rankin, as well as Pinal County Sheriff Paul Babeu (in his official capacity) and Pinal County under a respondeat superior theory of liability. Because we find a material dispute of facts as to whether or not Rankin's use of deadly force was reasonable, we reverse the district court's grant of summary judgment in the state cause of action as well.

## CONCLUSION

For the reasons set forth above, the district court's order granting Defendants' motions for summary judgment is **REVERSED**. The district court's order dismissing the family-member Plaintiffs' § 1983 claims is **AFFIRMED**, and the case is **REMANDED** for proceedings consistent with this opinion.