NOT FOR PUBLICATION

**FILED**

UNITED STATES COURT OF APPEALS

SEP 9 2025

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

K'AUN GREEN, an individual,

Plaintiff - Appellee,

v.

MARK MCNAMARA, in his individual capacity as a law enforcement officer for the City of San Jose,

Defendant - Appellant,

and

CITY OF SAN JOSE, a municipal corporation and ANTHONY MATA, in his individual capacity as a law enforcement officer for City of San Jose,

Defendants.

No. 24-1660

D.C. No.
5:22-cv-02174-NC

MEMORANDUM[*]

Appeal from the United States District Court
for the Northern District of California
Nathanael M. Cousins, Magistrate Judge, Presiding

Argued and Submitted March 6, 2025
San Francisco, California

Before: WARDLAW, PAEZ, and LEE, Circuit Judges.

---

[*]    This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

In the early morning of March 27, 2022, 20-year-old college student K'aun Green became involved in a fight at La Victoria Taqueria in downtown San Jose. Another man drew a gun, which Green eventually wrested away from him. Green backed out of the taqueria's front door, holding the gun in his left hand away from the other men involved in the fight. He used the same hand to prop open the door while using his right hand to keep the other participants back. The gun was pointed towards the ceiling with its butt against the door.

While responding to a fatal shooting nearby, San Jose Police Officer Mark McNamara learned from the crowd of a fight involving a gun at La Victoria. Followed by at least four other officers, McNamara approached the taqueria and climbed the short flight of stairs to its front porch. Green was in the taqueria's front doorjamb, facing into the restaurant, still using his left hand to prop the door open and hold the gun pointed upwards, when the officers arrived and shouted at him to drop the gun. Green had begun to turn, lowering the gun with his left hand, and raising his open right palm towards the officers when McNamara opened fire. McNamara fired five shots from a few feet away, four of which hit Green. After the first shot, Green dropped the gun, covered his head with his open hands, and collapsed backwards.

Green filed an action under 42 U.S.C. § 1983 alleging that McNamara used excessive force in violation of the Fourth Amendment and state law. McNamara

24-1660

moved for summary judgment based on qualified immunity, the district court denied the motion, and McNamara appealed.

We have jurisdiction to review an interlocutory appeal of the denial of a summary judgment motion based on qualified immunity. *Est. of Anderson v. Marsh*, 985 F.3d 726, 730-31 (9th Cir. 2021). However, our review is limited to the application of law and we may not review the district court's determinations concerning the sufficiency of the evidence to create a genuine dispute of fact for trial. *Id.*; *see also Johnson v. Jones*, 515 U.S. 304, 307 (1995). On appeal, we therefore apply the law to the facts that the district court assumed to be true after construing disputed evidence in the light most favorable to the nonmoving party. *See Tolan v. Cotton*, 572 U.S. 650, 651 (2014).

McNamara argues that *Scott v. Harris* requires us to revisit the district court's evidentiary sufficiency determinations because facts depicted in the video footage should be considered undisputed for the purposes of summary judgment. In *Harris*, the Supreme Court reversed the denial of qualified immunity in a § 1983 action because the version of events propounded by the plaintiff and adopted by the Court of Appeals was "quite clearly," "blatantly," and "utterly" contradicted by video evidence. 550 U.S. 372, 378, 380 (2007). The Court reasoned that the lower courts should have instead "viewed the facts in the light depicted by the videotape." *Id.* at 380-81.

*Harris* does not apply here because videos of the incident are arguably consistent with Green's version of the incident and do not settle material disputes that only a jury or trier of fact can decide. *See Longoria v. Pinal Cnty.*, 873 F.3d 699, 707-08 (9th Cir. 2017); *Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1177 n.7 (9th Cir. 2013). The district court correctly found that the video evidence could not decisively resolve the following material disputes: (1) what McNamara could see, (2) whether Green's actions were "aggressive," "furtive," or "harrowing," (3) whether Green appeared to be submitting or surrendering, and (4) whether McNamara had time to stop shooting after Green raised both hands and fell backwards. As the district court correctly concluded, a reasonable jury could resolve these disputes in Green's favor based on the real-time videos of the shooting and supporting testimonial evidence. Given our limited jurisdiction, we will not revisit the district court's factual determinations.

To defeat an officer's assertion of qualified immunity, a plaintiff seeking damages for excessive force must prove that the officer's conduct violated the Fourth Amendment and that the right violated was clearly established at the time. *Plumhoff v. Rickard*, 572 U.S. 765, 773 (2014).

Assessing whether the force used to effect a seizure is "reasonable" and thus permissible under the Fourth Amendment requires weighing the intrusiveness of the force against three factors: "the severity of the crime at issue, whether the

suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "The second factor is the most important." *Longoria*, 873 F.3d at 705.

"The intrusiveness of a seizure by means of deadly force is unmatched." *Tennessee v. Garner*, 471 U.S. 1, 9 (1985). Moreover, the first and third *Graham* factors unequivocally weigh in Green's favor. Whether the shooting violated Green's Fourth Amendment rights therefore depends on whether a reasonable officer in McNamara's position would have perceived Green to pose an immediate threat of death or serious physical injury to McNamara, the other officers, or bystanders. *See Graham*, 490 U.S. at 396 (holding that the "reasonableness" of a particular use of force "must be judged from the perspective of a reasonable officer on the scene").

A reasonable jury could find that McNamara violated Green's Fourth Amendment right not to be subjected to excessive force by shooting him as he surrendered. Police officers do not act reasonably when they shoot an armed individual who is surrendering or who does not pose an immediate threat. *See Longoria*, 873 F.3d at 705; *Curnow By & Through Curnow v. Ridgecrest Police*, 952 F.2d 321, 323, 325 (9th Cir. 1991). While an armed individual's "furtive movement, harrowing gesture, or serious verbal threat" may justify deadly force, a

jury could find that no such circumstances were present here. *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013); *see also C.V. ex rel. Villegas v. City of Anaheim*, 823 F.3d 1252, 1256 (9th Cir. 2016).

We also conclude that the law prohibiting McNamara from shooting Green under these circumstances was clearly established at the time by *Estate of Lopez v. Gelhaus*, 871 F.3d 998 (9th Cir. 2017) and supported by *George v. Morris*, 736 F.3d 829 (9th Cir. 2013), *C.V. ex rel. Villegas v. City of Anaheim*, 823 F.3d 1252 (9th Cir. 2016), and *Curnow By & Through Curnow v. Ridgecrest Police*, 952 F.2d 321 (9th Cir. 1991).

In *Estate of Lopez*, Officer Gelhaus fatally shot a thirteen-year-old, Andy Lopez ("A.L."), who was carrying a toy gun resembling an AK-47 pointed towards the ground. 871 F.3d at 1004. Gelhaus had previously confiscated an AK-47 within a mile of A.L.'s location. *Id*. at 1002. Upon Gelhaus's shouted command to drop the gun, A.L. did not do so, instead pausing and beginning to rotate his body toward the officers. *Id*. As "the gun c[a]me around" it "was beginning to rise." *Id*. at 1003-04. Once A.L. was facing the officers, Gelhaus shot him. *Id*.

In both *Lopez* and this case, the officer entered the scene with a specific apprehension of danger stemming from an unrelated prior incident, the individual appeared to be holding a firearm, the individual initially faced away from the officers and may not have known that the shouts came from police until he began

turning, the position of the firearm shifted as the individual moved, the defendant officer did not issue a warning specific to the use of deadly force, and the officer did not observe any aggressive behavior from the individual before shooting. *Id*. at 1002-04. In fact, Green posed less of a threat than A.L. in several ways: he lowered his gun while turning, while A.L.'s gun raised slightly; he was visibly surrendering; and he carried a handgun and not what appeared to be an assault rifle.

McNamara argues that *Lopez* is distinguishable because A.L.'s gun was initially pointed downwards instead of upwards. But he does not argue that an upward position is inherently more dangerous than a downward one, and either position requires a rotation of nearly 90 degrees before the gun could be pointed at a person. What is critical is that the gun was not aimed at any person. *See Curnow*, 952 F.2d at 325 (denying qualified immunity in part because the suspect-victim "did not point the gun at officers"); *Villegas*, 823 F.3d at 1256 (denying qualified immunity although the suspect-victim slightly raised his gun, because the motion was consistent with an attempt to comply with officer commands to raise his hands).

McNamara also argues that *Lopez* is distinguishable because "Green's finger was wrapped around the trigger." The video evidence, however, shows only that Green's finger was *near* the trigger of the gun. Moreover, in *Lopez*, the officers

specifically could not determine whether A.L.'s finger was on the trigger. *Lopez*, 871 F.3d at 1002. Although A.L.'s finger could have been on the trigger, the court nonetheless held that the officers were not entitled to qualified immunity.

Next, McNamara attempts to distinguish *Lopez* because no other civilians were present during that incident. *Id*. at 1003-04. But a greater number of people in the vicinity does not increase the officer's entitlement to qualified immunity; Green either posed an immediate threat to at least one other person or he did not.

Finally, the fact that Green had been a participant in a fight at the taqueria does not alter the qualified immunity analysis. We have often denied qualified immunity to officers for shooting individuals who appeared to have been engaged in dangerous, criminal, or chaotic activities. For example, in *George v. Morris*, police responded to a 911 call in which the wife of the individual who police ultimately shot exclaimed "No!" and "My husband has a gun!" 736 F.3d at 832. Likewise in *Curnow*, officers saw Curnow leaning over a bleeding woman, shaking her, with a semi-automatic weapon next to them. 952 F.2d at 323. They surrounded the house, broke down the front door, and shot Curnow as he raised his weapon and fled. *Id*. In both cases, the chaotic or apparently criminal circumstances did not alter the conclusion that deadly force was not necessary to avert any immediate threat to human life. And in both cases we concluded that the officers were not entitled to qualified immunity.

8                                                                24-1660

Because a reasonable jury could find, on the basis of the district court's assumed facts, that McNamara used excessive force when he shot a surrendering Green, and the law was clearly established at the time of the incident, the district court did not err in denying McNamara's motion for summary judgment based on qualified immunity.

**AFFIRMED**.