**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

RICHARD VOS, individually and as successor-in-interest to Gerritt Vos, and JENELLE BERNACCHI, individual, and as successor-in-interest to Gerritt Vos,

*Plaintiffs-Appellants*,

v.

CITY OF NEWPORT BEACH, a governmental entity; RICHARD HENRY; NATHAN FARRIS; DAVE KRESGE; DOES, 1–10, inclusive,

*Defendants-Appellees.*

No. 16-56791

D.C. No.
8:15-cv-00768-JVS-DFM

OPINION

Appeal from the United States District Court
for the Central District of California
James V. Selna, District Judge, Presiding

Argued and Submitted April 12, 2018
Pasadena, California

Filed June 11, 2018

Before:  Carlos T. Bea and Mary H. Murguia, Circuit
Judges, and Donald W. Molloy,[*] District Judge.

Opinion by Judge Molloy;
Dissent by Judge Bea

---

**SUMMARY**[**]

---

### Civil Rights

The panel affirmed in part and reversed in part the district court's summary judgment and remanded in a 42 U.S.C. § 1983 action alleging that police officers used excessive deadly force when they fatally shot Gerritt Vos.

The police responded to a call about a man behaving erratically and brandishing a pair of scissors at a 7-Eleven. The shooting happened while the police were deciding how to handle the situation, and Vos unexpectedly charged the doorway of the store with what appeared to be a weapon raised above his head.

The panel held that the facts were such that a reasonable jury could conclude that Vos was not an immediate threat to the officers.  The panel noted that the officers had surrounded the front door to the 7-Eleven, had established positions behind cover of their police vehicles, and

---

[*] The Honorable Donald W. Molloy, United States District Judge for the District of Montana, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

outnumbered Vos eight to one. The panel further noted that although officers saw that Vos had something in his hand as he charged them, they did not believe he had a gun, and that the officers had less-lethal methods available to stop Vos from charging. The panel noted that it was undisputed that Vos was mentally unstable and that this created a genuine issue of fact as to whether the government's interest in using deadly force was diminished. The panel nevertheless held that the defendant officers were entitled to qualified immunity on the § 1983 claims because existing precedent did not clearly establish, beyond debate, that the officers' acted unreasonably under the circumstances.

The panel held that because a reasonable jury could find that the officers violated Vos's Fourth Amendment rights, it was appropriate to remand plaintiffs' conspiracy claims and claims brought pursuant to *Monell v. Dep't of Soc. Serv. of City of N.Y.*, 436 U.S. 658 (1978) to the district court to consider in the first instance.

The panel held that on the record before it, the defendants were not entitled to summary adjudication of plaintiffs' claims under the American with Disabilities Act and the Rehabilitation Act, and reversed the district court's ruling to the contrary. The panel held that the district court erred when it found that there was no failure to accommodate because the officers did not initiate the confrontation. The panel determined that the officers had the time and opportunity to assess the situation and potentially employ accommodations, including de-escalation, communication, or specialized help. The panel also reversed the district court's summary adjudication of plaintiffs' negligence and remaining state law claims.

Dissenting, Judge Bea stated that because in his view the officers reacted reasonably to the threat they faced, he would affirm the decision of the district court.

## COUNSEL

Paul L. Hoffman (argued), Schonbrun Seplow Harris & Hoffman LLP, Los Angeles, California; Milton Grimes, Los Angeles, California; Jason P. Fowler and R. Rex Parris, R. Rex Parris Law Firm, Lancaster, California; for Plaintiffs-Appellants.

Daniel Phillip Barer (argued), Pollak Vida & Barer, Los Angeles, California; Allen Christiansen and Peter J. Ferguson, Ferguson Praet & Sherman APC, Santa Ana, California; for Defendants-Appellees.

## OPINION

MOLLOY, District Judge:

On May 29, 2014, officers of the City of Newport Beach Police Department fatally shot Gerritt Vos ("Vos"). The police responded to a call about a man behaving erratically and brandishing a pair of scissors at a 7-Eleven. The shooting happened while the police were deciding how to handle the situation, and Vos unexpectedly charged the doorway of the store with what appeared to be a weapon raised above his head. Vos's parents filed this action against the officers and the City, raising claims under federal and state law. The district court granted summary judgment in favor of the defendants, concluding that the officers' use of force was objectively reasonable. Vos's parents appeal that

decision. We have jurisdiction under 28 U.S.C. § 1291, and we affirm in part, reverse in part, and remand.

## FACTUAL BACKGROUND

The record is viewed in the light most favorable to the nonmovants, Richard Vos and Jenelle Bernacchi (the "Parents"), *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam), so long as their version of the facts is not blatantly contradicted by the video evidence, *Scott v. Harris*, 550 U.S. 372, 378–79 (2007). The mere existence of video footage of the incident does not foreclose a genuine factual dispute as to the reasonable inferences that can be drawn from that footage. *See id.* at 380 (focusing on whether a party's version of events "is so utterly discredited by the record that no reasonable jury could have believed him").

At approximately 8:15 p.m. on May 29, 2014, Vos entered a 7-Eleven convenience store. Vos became agitated; he ran around the store shouting things like "[k]ill me already, dog." Someone called 911. For approximately the next six minutes, Vos ran around the store cursing at people. Meanwhile, the video footage shows other customers going about their business of shopping and checking out at the cash register. The Newport Beach Police Department dispatch stated that "the reporting party is advising that the subject is holding a pair of scissors inside the store and there are still people inside." At one point, Vos grabbed and immediately released a 7-Eleven employee, yelling "I've got a hostage!"

At about 8:25 p.m. Officer David Kresge ("Kresge") arrived at the scene. Officer Kresge spoke to some bystanders who indicated Vos was still in the store and Officer Kresge signaled to the remaining clerks to exit the building. The clerks said that Vos had armed himself with scissors and one employee had been cut on the hand while

trying to disarm Vos before authorities arrived, resulting in a "half-inch laceration." Officer Kresge saw Vos behind the 7-Eleven's glass doors yelling, screaming, and pretending to have a gun. Officer Kresge broadcasted on the police radio that "the subject is simulating having a hand gun behind his back and is asking me to shoot him." Officer Kresge then saw Vos go into the back room and shut the door. Officer Kresge asked for backup and specifically asked for a 40-millimeter less-lethal projectile launcher.[1] As other officers arrived, Officer Kresge informed them that Vos was agitated and likely under the influence of narcotics.

By 8:30 p.m., several more officers arrived, including Defendants Officer Richard Henry ("Henry") and Officer Nathan Farris ("Farris"). Immediately before the fatal shooting, at least eight officers were present. The police positioned two police cars outside the store's front entrance in a "v" formation and used the vehicles' doors for cover. Trainee Officer Andrew Shen ("Shen") armed himself with the requested 40 millimeter less-lethal device. The others readied themselves with lethal weapons: Officers Henry and Farris armed themselves with AR-15 rifles,[2] while Officer Kresge held a handgun. The police propped open the 7-Eleven doors and Officer Shawn Preasmyer ("Preasmyer") set up a public address system, getting ready to communicate with Vos. There was also a canine unit on the scene. The officers knew that Vos had been simulating having a gun and that he was agitated, appeared angry, and was potentially

[1] The Newport Police Department differentiates between "non-lethal" means (holds and pain compliance techniques) and "less-lethal" means (baton, 40 millimeter, taser, and aerosol).

[2] Officer Farris initially grabbed a 40-millimeter less lethal when he arrived at the scene but went back to his car and switched to an AR-15. He also directed Officer Shen to move to a better vantage point.

mentally unstable or under the influence of drugs. They also heard Vos yell "shoot me" and other similar cries. The police on site talked about using non-lethal force to subdue Vos both over the radio and amongst themselves at the scene.

At about 8:43 p.m., Vos opened the door of the 7-Eleven's back room. As he did so, some officers shouted "doors opening." Vos then ran around the front check-out counter and towards the open doors. As he ran, he held an object over his head in his hand. The distance between Vos and the officers at the point he started running was approximately 30 feet. One officer shouted that Vos had scissors. Over the public address system, Officer Preasmyer twice told Vos to "Drop the weapon." Vos did not drop the object and instead kept charging towards the officers. Officer Preasmyer then shouted "shoot him." Officer Preasmyer later testified that this order was directed solely to Officer Shen. Officer Shen fired his less-lethal weaponry and, within seconds, Officers Henry and Farris fired their AR-15 rifles.[3] No other officers fired. Vos continued to run as he was struck by the bullets, collapsing on the sidewalk in front of the officers. Vos was shot four times and died from his wounds. About eight seconds elapsed from the time Vos came out of the back room to when he was killed.

Somewhere around 20 minutes passed from when officers arrived until Vos ran at them. During this time, the officers did not communicate with Vos. Officers Shen and Farris later testified that they did not hear Officer Preasmyer's command to shoot, and Officer Henry testified that he heard it but did not react to it. Neither Henry nor

---

[3] Eight shots were fired, four by each officer. Officer Shen fired once, resulting in nine shots total.

Farris knew that Officer Shen had fired the less-lethal weaponry. They also testified that they saw a metallic object in Vos's hand, which they believed to be scissors. After the shooting, a "pronged metal display hook was found on the ground a few feet from where [Vos] had collapsed." While the officers only suspected the possibility of substance abuse, Vos's blood later tested positive for both amphetamine and methamphetamine. Vos's medical history later revealed that he had been diagnosed as schizophrenic.

## PROCEDURAL BACKGROUND

Vos's Parents brought this suit as Vos's lawful heirs and successors-in-interest against the City of Newport Beach, Officer Henry, Officer Farris, and Officer Kresge,[4] alleging twelve causes of action: (1) excessive force in violation of the Fourth Amendment, 42 U.S.C. § 1983; (2) violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131; (3) violation of the Rehabilitation Act, 29 U.S.C. § 701; (4) violation of civil rights due to loss of familial relationship, 42 U.S.C. § 1983; (5) municipal and supervisory liability, 42 U.S.C. § 1983; (6) wrongful death (negligence); (7) wrongful death (negligent hiring, training and retention); (8) battery; (9) assault; (10) violation of civil rights, Cal. Civ. Code § 52.1; (11) survivor claims; and (12) civil conspiracy, 42 U.S.C. § 1983. The district court granted the defendants' motion for summary judgment as to all of the Parents' claims and judgment was entered in favor of the defendants. The Parents appeal that judgment.[5]

---

[4] The parties later stipulated to the dismissal of Officer Kresge.

[5] The Parents do not challenge the district court's summary adjudication of their Fourteenth Amendment claim for deprivation of a

## DISCUSSION

We review de novo a grant of summary judgment, *Blankenthorn v. City of Orange*, 485 F.3d 463, 470 (9th Cir. 2007), "and in 'determining whether summary judgment is appropriate, view the evidence in the light most favorable to the non-moving party.'" *Lal v. California*, 746 F.3d 1112, 1115–16 (9th Cir. 2014) (quoting *Garcia v. Cty. of Merced*, 639 F.3d 1206, 1208 (9th Cir. 2011)) (alteration omitted). Summary judgment is appropriate where the record, read in the light most favorable to the non-movant, indicates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## I.  Excessive Force

To determine whether the use of force was objectively reasonable, the court balances the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (quotations and citations omitted).

### A.  Nature of the Intrusion

The officers used deadly force against Vos.  "The intrusiveness of a seizure by means of deadly force is unmatched." *Tennessee v. Garner*, 471 U.S. 1, 9 (1985). "The use of deadly force implicates the highest level of Fourth Amendment interests both because the suspect has a 'fundamental interest in his own life' and because such force

---

familial relationship.  We therefore do not address it.  *Dennis v. BEH-1, LLC*, 520 F.3d 1066, 1069 n.1 (9th Cir. 2008).  The district court also made a number of evidentiary rulings that are not at issue on appeal.

'frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment.'" *A.K.H. ex rel. Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016) (quoting *Garner*, 471 U.S. at 9). Because no one disputes that the officers used the highest level of force against Vos, the issue is determining whether the governmental interests at stake were sufficient to justify it.

## B. Governmental Interests

The strength of the government's interest is measured by examining three primary factors: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. As explained below, on these facts, a reasonable jury could conclude that the government's interests were insufficient to justify the use of deadly force under these circumstances.

First, the officers were not responding to the report of a crime. *See Glenn v. Wash. Cty.*, 673 F.3d 864, 874 (9th Cir. 2011) (identifying that the "character of the offense" is "an important consideration" especially when no crime has been identified). Rather, law enforcement was contacted because of Vos's erratic behavior. In fact, the officers discussed at

the scene what crime may have been committed, speculating "false imprisonment" and stating "let's get a good crime."**[6]**

Second, once the officers were at the scene, there was little opportunity for Vos to flee. While closing himself in the back room could be perceived as an attempt to evade arrest, officers never initially spoke to Vos or gave him any commands as to make his behavior noncompliant. *See Bryan v. MacPherson*, 630 F.3d 805, 830 (9th Cir. 2010) (noting that while "passive resistance" can support the use of force, "the level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance").

The most important factor, however, is whether Vos posed an immediate threat to the safety of officers or others. *See Longoria v. Pinal Cty.*, 873 F.3d 699, 705 (9th Cir. 2017) (explaining that the second factor, whether the suspect poses an immediate threat to the safety of the officers or others, is the most important). In considering "whether there was an immediate threat, a simple statement by an officer that he fears for his safety or the safety of others is not enough; there

---

**[6]** The dissent suggests that, under California law, Vos "likely could have been charged with" assault with a deadly weapon, false imprisonment, criminal threats, and disturbing the peace. Yet, the police initially were called in response to Vos's erratic behavior. When Officer Kresege arrived, he learned that one store clerk had been cut while trying to disarm Vos before authorities arrived, and he watched as Vos yelled, simulated having a handgun, and shut himself in the back room. Taking the facts in the light most favorable to the Parents, which we are required to do at this stage, *see Mattos v. Agarano*, 661 F.3d 433, 449 (9th Cir. 2011), it is not clear that the "crime at issue" in this case was one of the severe crimes the dissent identifies. Accordingly, this factor does not weigh in favor of finding that the officers' use of deadly force was reasonable, especially in light of the other facts and circumstances in this case.

must be objective factors to justify such a concern." *Mattos v. Agarano*, 661 F.3d 433, 441–42 (9th Cir. 2011) (en banc) (internal quotation marks and citation omitted).

Here, the facts are such that a reasonable jury could conclude that Vos was not an immediate threat to the officers. The officers had surrounded the front door to the 7-Eleven, had established positions behind cover of their police vehicles, and outnumbered Vos eight to one. The officers saw that Vos had something in his hand as he charged them, but they did not believe he had a gun, and the officers had less-lethal methods available to stop Vos from charging. Even though only eight seconds passed between when Vos emerged from the back room and when he was shot, construing the facts as they are presented by the Parents and depicted in the video footage, a reasonable jury could conclude that Vos did not pose an immediate threat such that the use of deadly force was warranted.[7]

The defendants argue that Vos "forced the confrontation" by charging the officers, and the immediacy of the threat is comparable to that in *Lal v. California*. In *Lal*, officers responded to a domestic violence call followed by a 45-minute high-speed car chase. 746 F.3d at 1113–14.

_____

[7] The dissent contends that our analysis ignores the fact that the officers had mere seconds to decide whether to deploy deadly force. That is not the case. Rather, the mere seconds that elapsed between when Vos emerged from the back room is one factor in the analysis. While the "calculus of reasonableness must embody the allowance for the fact that police officers are often forced to make split-second judgments," the analysis requires the court to look at all the facts and circumstances surrounding the interaction, which also includes that the officers had non-lethal means of stopping Vos, outnumbered Vos eight to one, did not believe that Vos had a gun, and had established positions of cover behind their vehicles, which also prevented Vos from easily escaping. *See, e.g.*, *Graham*, 490 U.S. at 396–97.

During the pursuit, officers learned that Lal wanted them to shoot him and he wanted to kill himself. *Id.* at 1114. After Lal's vehicle was disabled, he got out and officers told him to put his hands in the air. *Id.* Lal briefly complied before putting his hands in his pockets and saying "just shoot me, just shoot me." *Id.* Lal then reached down, grabbed rock, and smashed it repeatedly into his own forehead. *Id.* He also attempted to pull a metal stake out of the ground to impale himself. *Id.* Lal then approached the officers while carrying a rock in his hand and pretended his cell phone was a gun, and he threw several soft-ball sized rocks at the officers, and one struck a spotlight on a patrol car. *Id.* The officers asked for "less than lethal assistance" and were told a canine unit was on the way. *Id.* Lal picked up a large, football-sized rock and continued to advance on officers despite their commands. *Id.* The officers fired on Lal when he was a few feet away, killing him. *Id.* at 1115. We held that the officers reasonably believed that Lal would heave the rock at them, emphasizing that Lal "forced the issue by advancing on the officers," and "[t]he fact that Lal was intent on 'suicide by cop' did not mean that the officers had to endanger their own lives by allowing Lal to continue in his dangerous course of conduct." *Id.* at 1117–18 (finding "no suggestion that the officers intentionally provoked Lal. Rather, the totality of the circumstances shows that they were patient. . . . Instead, it was Lal who forced the confrontation").

Yet, important facts distinguish this case from *Lal*. First, and perhaps most significantly, while the officers in *Lal* requested less-lethal means, they had not yet arrived when Lal advanced on them. 746 F.3d at 1114. Here, by the time Vos advanced, eight officers had arrived on the scene, Officer Shen was armed with the 40-millimeter less lethal firearm, there was a canine unit present, and other officers

had tasers. The officers also had the door surrounded and had established defensive cover using police vehicles. *See Blanford v. Sacramento Cty.*, 406 F.3d 1110, 1118 (9th Cir. 2005) (specifically noting that a suspect "was not surrounded" in determining use of deadly force reasonable under circumstances); *Longoria*, 873 F.3d at 705 (focusing on the fact the suspect was surrounded in finding a genuine question as to whether officers used excessive force).

Second, while we concluded that using an alternative force on Lal (pepper spray) would not have prevented him from hurling the rock, *Lal*, 746 F.3d at 1119, it is not clear that the use of any of the above less-lethal means on Vos would have been ineffective. Vos was within 20 feet of the officers when he was shot, a distance within the range of the 40-millimeter less-lethal weapon, a taser, or a canine. Although officers are not required to use the least intrusive degree of force available, *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994), "the availability of alternative methods of capturing or subduing a suspect may be a factor to consider," *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (citation omitted).

Third, Lal already had led officers on a 45-minute high-speed car chase when he was shot, which had endangered the lives of other drivers and the officers pursuing him, and therefore demonstrated that he was a serious danger to himself and others. *Lal*, 746 F.3d at 1114, 1117. Here, one clerk was cut on the palm of his hand by Vos's scissors while attempting to disarm Vos before the police arrived, but Vos had not otherwise endangered himself or the 7-Eleven patrons.

Finally, while Lal was on the side of the freeway and could have escaped and risked harm to other individuals, *Lal*, 746 F.3d at 1117, Vos was alone in the 7-Eleven and at

least eight officers and their vehicles served as a barricade between Vos and the public.

While we concluded that the officers in Lal reasonably employed deadly force, *Lal* does not compel the same conclusion here where officers had non-lethal means ready and available, Vos had not previously harmed or endangered the lives of others, apart from his confrontation with the store clerk, and eight officers surrounded Vos with their vehicles. The facts and circumstances confronting the officers here are such that whether Vos posed an immediate threat is a disputed question of fact, and one the jury could find in the Parents' favor.[8]

Additionally, the *Graham* factors are not exclusive. Other relevant factors include the availability of less intrusive force, whether proper warnings were given, and whether it should have been apparent to the officers that the subject of the force used was mentally disturbed. *See Bryan*, 630 F.3d at 831; *Deorle v. Rutherford*, 272 F.3d 1272, 1282–83 (9th Cir. 2001).

Here, it is undisputed that the officers had less intrusive force options available to them. *See Bryan*, 630 F.3d at 831. Whether the officers warned Vos that they would use deadly force is more complicated. On one hand, "[e]verything happened within eight seconds," giving officers little to no time to warn Vos that they would use deadly force. On the

---

[8] The Parents also raise a factual dispute as to whether Officers Shen, Henry, and Farris heard the command to shoot. But the order to shoot is not material to whether the use of lethal force was objectively reasonable. *See Graham*, 490 U.S. at 397 ("[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.").

other hand, the officers had upwards of 15 minutes to create a perimeter, assemble less-lethal means, coordinate a plan for their use of force, establish cover, and, arguably, try to communicate with Vos.   While a Fourth Amendment violation cannot be established "based merely on bad tactics that result in a deadly confrontation that could have been avoided," *Billington v. Smith*, 292 F.3d 1177, 1190 (9th Cir. 2002); *see also City & Cty. of S.F. v. Sheehan (Sheehan II)*, 135 S. Ct. 1765, 1777 (2015), the events leading up to the shooting, including the officers tactics, are encompassed in the facts and circumstances for the reasonableness analysis, *see Hung Lam v. City of San Jose*, 869 F.3d 1077, 1087 (9th Cir. 2017); *see also Bryan*, 630 F.3d at 831.

Finally, it is undisputed that Vos was mentally unstable, acting out, and at times invited officers to use deadly force on him.   These indications of mental illness create a genuine issue of material fact about whether the government's interest in using deadly force was diminished. *See Longoria*, 873 F.3d at 708.   Indeed, other than Henry and Farris, six "[o]ther officers appear to have been aware of this and prepared to respond accordingly by employing only non-lethal weapons." *Id.*[9]

---

[9] The dissent asserts that our opinion creates a "*per se* rule that in *all* circumstances the governmental interest in deadly force is diminished where the suspect is mentally ill."  That is not our intent. Rather, whether the suspect has exhibited signs of mental illness is one of the factors the court will consider in assessing the reasonableness of the force used, in addition to the *Graham* factors, the availability of less intrusive force, and whether proper warnings were given.   Although this Court has "refused to create two tracks of excessive force analysis, one for the mentally ill and one for serious criminals," our precedent establishes that if officers believe a suspect is mentally ill, they "should . . . ma[k]e a greater effort to take control of the situation through less intrusive

Balancing all of these considerations, a reasonable jury could find that "the force employed was greater than is reasonable under the circumstances." *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1058 (9th Cir. 2003) (internal quotation marks and citation omitted). Summary adjudication of the Parents' Fourth Amendment claim on these grounds was therefore inappropriate.

## II. Qualified Immunity

Despite factual issues which preclude summary judgment on the issue of whether the officer's violated Vos's Fourth Amendment rights, that is not the end of the inquiry. The individual officers are protected "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "In determining whether an officer is entitled to qualified immunity, we consider (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *Lal*, 746 F.3d at 1116. Because the district court concluded that no constitutional violation occurred, it did not reach the question of whether the law was clearly established.[10] On

---

means." *Bryan*, 630 F.3d at 829. Here, the fact that Vos was acting out and had invited the officers to use deadly force on him is sufficient under our precedent for a reasonable jury to conclude that the government's interest in using deadly force on Vos was diminished, *see Longoria*, 873 F.3d at 708, especially in light of the other facts and circumstances in this case.

[10] The defendants argue that the Parents waived any argument as to qualified immunity because they did not address it in their opening brief.

this record, we conclude that the individual officers are entitled to qualified immunity as a matter of law. *Kisela v. Hughes*, ___ U.S. ___, 138 S. Ct. 1148 (2018).

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012)). In determining whether the law has been clearly established, there does not need to be "a case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 740 (2011). The Supreme Court has repeatedly admonished courts "not to define clearly established law at a high level of generality." *Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 742). The dispositive question is therefore "whether the violative nature of *particular* conduct is clearly established" in the specific context of the case. *Id.* (internal quotation marks and citation omitted). "It is the plaintiff who bears the burden of showing that the rights allegedly violated were clearly established." *Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017) (internal quotation marks and citation omitted).

Here, officers confronted a reportedly erratic individual that took refuge in a 7-Eleven, cut someone with scissors, asked officers to shoot him, simulated having a firearm, and ultimately charged at officers with something in his upraised

---

But because the district court did not address qualified immunity, the Parents' omission does not amount to waiver. *See Rodriguez v. Hayes*, 591 F.3d 1105, 1118 n.6 (9th Cir. 2010); *see also Koerner v. Grigas*, 328 F.3d 1039, 1049 (9th Cir. 2003) (recognizing an exception to waiver when the issue is raised in the appellee's brief).

hand.   The relevant inquiry is whether existing precedent placed the conclusion that officers acted unreasonably in these circumstances "beyond debate."   *Mullenix*, 136 S. Ct. at 309.  It did not.  *See Kisela*, 138 S. Ct. at 1553–54 (recently holding that the law was not clearly established where officers shot a mentally ill woman holding a kitchen knife by her side standing in close proximity to her roommate). Because Vos acted aggressively, the law was not established by either *Deorle* or *Bryan.   See S.B. v. Cty. of San Diego*, 864 F.3d 1010, 1016 n.5 (9th Cir. 2017) (refusing to extend law established in *Deorle* and the like to situations involving an aggressive or threatening suspect).  Rather, as discussed above, the most analogous case is likely *Lal*, which was decided two months before the events that took place here. 746 F.3d 1112; *see also Blanford*, 406 F.3d at 1119 (holding that deputies were entitled to qualified immunity for shooting a suspect wandering around a neighborhood with a raised sword, growling, and ignoring commands to drop the weapon); *S.B.*, 864 F.3d at 1015–17 (holding law not clearly established where officers used deadly force on a mentally ill individual with knives in his pockets when he drew one); *Woodward v. City of Tucson*, 870 F.3d 1154 (9th Cir. 2017) (holding the law not clearly established in May 2014 where officers used deadly force on a suspect who attacked them in his apartment while growling and brandishing a broken hockey stick).   And even if officers were mistaken, that mistake was reasonable given the decision in *Lal*.  *Mullenix*, 136 S. Ct. at 311 (noting that even though the "wisdom" of the officer's choice not to use less intrusive means may be questionable, Supreme Court "precedents do not place the conclusion that he acted unreasonably in these circumstances beyond debate") (internal quotation marks and citation omitted).

Accordingly, the defendant officers are entitled to qualified immunity on the § 1983 claims and the district court's grant of summary judgment as to the individual officers is affirmed on that ground. *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) ("We may affirm on any ground supported by the record, regardless of whether the district court relied upon, rejected, or even considered that ground.") (internal quotation marks and citation omitted).

## III.    *Monell*[11] and Civil Conspiracy

When the district court found no constitutional violation, it also granted summary judgment in favor of the City of Newport Beach as to the Parents' *Monell* and civil conspiracy claims. Because a reasonable jury could find that the officers violated Vos's Fourth Amendment rights, these claims are remanded to the district court to consider in the first instance.

## IV.    ADA and Rehabilitation Act

We, like the district court, analyze the Parents' ADA and Rehabilitation Act claims together because the statutes provide identical "remedies, procedures and rights." *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000). Title VII of the ADA prohibits a public entity from discriminating against any "qualified individual with a disability." *Sheehan v. City & Cty. of S.F.*, 743 F.3d 1211, 1231 (9th Cir.), *cert. granted sub nom., City & Cty. of S.F., Cal. v. Sheehan*, 135 S. Ct. 702 (2014), and *rev'd in part, cert. dismissed in part sub nom.*, *Sheehan II*, 135 S. Ct. at 1778 (hereinafter *Sheehan I*). Title VII applies to arrests. *Id.* at 1232.

---

[11] *Monell v. Dep't of Soc. Serv. of City of N.Y.*, 436 U.S. 658 (1978).

Although the Supreme Court granted certiorari as to whether Title II requires "any accommodation of an armed and violent individual," it later dismissed that issue as improvidently granted. *Sheehan II*, 135 S. Ct. at 1772, 1774. *Sheehan I* therefore controls:

> To state a claim under Title II of the ADA, a plaintiff generally must show: (1) []he is an individual with a disability; (2) []he is otherwise qualified to participate in or receive the benefit of a public entity's services, programs or activities; (3) []he was either excluded from participation in or denied the benefits of the public entity's services, programs or activities or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits or discrimination was by reason of h[is] disability.

743 F.3d at 1232.

In *Sheehan I*, officers responded to a call at a group home to perform a welfare check on a mentally ill woman after she threatened a social worker with a knife when he entered her room. *Id.* at 1217. When officers entered her room, she grabbed a knife and began to aggressively approach them, yelling at them to get out. *Id.* at 1218–19. The officers retreated, closed the door, and called for backup. *Id.* at 1219. But, instead of waiting, the officers forcibly reentered the room, pepper sprayed the woman and, when she continued to advance, shot her five or six times. *Id.* at 1219–20. We held that a reasonable jury could find that "the situation had been defused sufficiently, following the initial retreat from [the] room, to afford the officers an opportunity to wait for

backup and to employ less confrontational tactics." *Id.* at 1233.

Here, the district court found no provocation (i.e., that officers did not initiate the confrontation) and so found no failure to accommodate, distinguishing this case from *Sheehan I*. The Parents argue that in doing so, the district court improperly read a provocation requirement into accommodation. They are correct. While *Sheehan I* addresses provocation in the context of a plaintiff's excessive force claim, *see* 743 F.3d at 1230, the reasonableness of accommodation under the circumstances is an entirely separate fact question, *see id.* at 1233 (citing *EEOC v. UPS Supply Chain Solutions*, 620 F.3d 1103, 1110 (9th Cir. 2010)). Similar to the situation in *Sheehan I*, the officers here had the time and the opportunity to assess the situation and potentially employ the accommodations identified by the Parents, including de-escalation, communication, or specialized help. While the defendants rely on the officers' pre-shooting conduct to argue they accommodated Vos to the extent required by the law, those facts arguably show further accommodation was possible.

Moreover, the district court's decision was based in part on its earlier determination that the officers' actions were objectively reasonable. The same fact questions that prevent a reasonableness determination inform an accommodation analysis. They also undercut the defendants' argument that because Vos posed an immediate threat he was not entitled to accommodation. 28 C.F.R. § 35.139(a). Finally, the defendants insist that Title II of the ADA and the Rehabilitation Act do not apply because Vos's behavior stemmed from his illegal drug use, not a mental illness. 28 C.F.R. § 35.131(a). Because the district court concluded there was no failure to accommodate, it did not address the

applicability of the ADA based on these grounds. We decline to address this question in the first instance.

On this record, the defendants are not entitled to summary adjudication of the Parents' ADA and Rehabilitation Act claims and the district court's ruling to the contrary is reversed.

## V.  State Law Claims

### A.  Negligence

The Parents bring their negligence claims under state law. The California Supreme Court articulated the relevant standard for these claims in *Hayes v. County of San Diego (Hayes I)*, 305 P.3d 252 (Cal. 2013). In California, police officers "have a duty to act reasonably when using deadly force." *Id.* at 256. To determine police liability, a court applies tort law's "reasonable care" standard, which is distinct from the Fourth Amendment's "reasonableness" standard. *Id.* at 262. The Fourth Amendment is narrower and "plac[es] less emphasis on preshooting conduct." *Id*. Because the district court erred in holding that use of deadly force was objectively reasonable under the Fourth Amendment, we reverse its summary adjudication of the Parents' negligence claim. *See C.V. ex rel. Villegas v. City of Anaheim*, 823 F.3d 1252, 1257 n.6 (9th Cir. 2016) (noting that "state negligence law . . . is broader than federal Fourth Amendment law") (quoting *Hayes I*, 305 P.3d at 263).

### B.  Remaining State Law Claims

Similarly, because the district court found that the officers used reasonable force, it granted summary judgment in favor of the defendants on the Parents' claims under state law causes of action for assault, battery, and California Civil

Code § 52.1.  It also granted summary judgment for the defendants on the Parents' survivor claims, stating it does not provide independent methods of recovery.  Because the district court erred in holding that use of deadly force was objectively reasonable, we reverse its grant of summary judgment as to the remaining state law claims.  *Villegas*, 823 F.3d at 1257 ("[T]he doctrine of qualified immunity does not shield defendants from state law claims."  (citing *Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1171 Cir. 2013)).

## CONCLUSION

We affirm in part the district court's summary adjudication of the Parents' Fourth Amendment excessive force claim insofar as the individual officers are entitled to qualified immunity.  We reverse the district court's decision in all other respects.[12]  The case is remanded for the district court's consideration of those claims.

## AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.

BEA, Circuit Judge, dissenting in part:

"Detached reflection cannot be demanded in the presence of an uplifted knife.  Therefore in this Court, at least, it is not a condition of immunity that one in that situation should pause to consider whether a reasonable man might not think it possible to fly with safety or *to disable his*

---

[12] Neither the Parents' Fourteenth Amendment familial relationship claim nor the district court's evidentiary rulings were challenged on appeal.  Therefore, our decision does not impact those rulings.

*assailant rather than to kill him*." *Brown v. United States*, 256 U.S. 335, 343 (1921) (Holmes, J.) (reversing a defendant's conviction for second degree murder and finding no obligation for defendant to retreat rather than use deadly force when presented with the immediate mortal threat of an uplifted knife) (emphasis added).

Before Vos charged at Newport Beach police officers, the officers had been informed by a store employee that Vos had wielded scissors to stab a store employee, and saw that Vos had refused to drop his weapon when ordered by bullhorn to do so. Instead of dropping the weapon as police ordered, Vos raised the metal weapon above his head, and from approximately forty feet away charged full speed at the officers. An officer bullhorned an order "shoot him." Two of the officers shot him. Because deadly force in such a circumstance is reasonable, I respectfully dissent in part.[1]

There is no dispute as to what occurred, as much of it is captured on 7-Eleven's video cameras. At approximately 8:15 PM on May 29, 2014, Vos entered a 7-Eleven convenience store in Newport Beach, California. Vos was agitated, and ran around the store shouting "[k]ill me already" and other provocations**.** Someone in the store called 911. At one point Vos grabbed and then released a 7-Eleven employee and shouted "I've got a hostage." The Newport Beach Police Department radio stated that "the reporting party is advising that the subject is holding a pair of scissors inside the store and there are still people inside." At 8:20 PM, Officer Kresge arrived at the scene. He testified at his deposition that when he arrived outside the 7-Eleven Vos was "yelling and screaming." Kresge made eye contact with

---

[1] I concur with the majority that the individual officers are entitled to qualified immunity.

the clerks and signaled them to get out of the store. One of the clerks told Kresge that Vos had "armed himself with scissors and that one of them had been stabbed in the hand." Kresge saw that Vos had wrapped a garment around his right hand and had begun to pantomime with his hand as if he were holding a gun. Kresge did not enter the store or engage Vos; instead, he waited for backup.[2] Several other officers arrived, including Defendant-Officers Richard Henry and Nathan Farris, and Officer Andrew Shen.

The Officers positioned their vehicles outside the store's front entrance and took positions behind the doors of their cars. Officers Henry and Ferris, each positioned behind a car door, armed themselves with AR-15 rifles. Officer Kresge pulled out a handgun. Officer Shen was armed with a non-lethal projectile launcher. The officers propped open the door to the 7-Eleven. Another policeman, Officer Preasmyer, set up a public address system (the bullhorn) and prepared to communicate with Vos. The officers had fully surrounded the entrance to the 7-Eleven.

What followed was captured on video by the police dash-cams and the 7-Eleven surveillance cameras[3]: At approximately 8:43 PM – 23 minutes after Kresge first arrived at the scene – Vos opened the door to the 7-Eleven's back room. The officers shouted "doors opening." After going towards the back door, Vos turned around and ran around the counter and towards the front of the store. As Vos

---

[2] Plaintiffs do not contradict Officer Kresge's testimony.

[3] The video of the shooting from multiple angles is in the appellate Record and may be seen here: http://cdn.ca9.uscourts.gov/datastore/opinions/media/16-56791-Exhibit-12-Shooting.mp4. An appellate court may view such video evidence to determine the propriety of summary judgment. *Scott v. Harris*, 550 U.S. 372, 377–81 (2007).

ran, he held a metal object above his head in his left hand. One officer shouted "he's got scissors." Over the public address system, Officer Preasmyer instructed "Drop the weapon!" Vos did not drop the object, but instead ran full steam toward the officers. Officer Preasmyer said "Shoot him." Officers Henry and Farris fired their AR-15 rifles, while Shen fired his non-lethal weaponry. Vos was shot and collapsed on the sidewalk and parking lot in front of the officers. He died from his wounds. According to an expert report submitted by Defendants, based on his rate of speed Vos would have traveled the 41.1 feet from the back of the store to the police officers' positions in 3.4 seconds.[4] Indeed, the video shows that the officers had approximately two seconds to decide to shoot Vos after having warned him to drop his weapon.

While the majority opinion recites the factors in *Graham v. Connor*, 490 U.S. 386, 396 (1989), it misapplies them. As the majority notes, *Graham* instructs us to consider three primary factors when evaluating the reasonableness of a police officer's use of force: (1) "the severity of the crime at

---

[4] The 41.1 feet, and the rate of speed at which Vos was traveling, was calculated by Defendant's expert Craig Fries, who analyzed the audio and video evidence and incorporated measurements of the scene. He used the following distances: 27.5 feet from the back of the store to the 7-Eleven's door threshold, 9.1 feet from the door threshold to the white parking block adjacent to the closest police car, and 4.5 feet from the front wheel edge of the closest police car to the location of officers Shen and Farris. He calculated Vos's speed in part by analyzing the frame rate of one of the 7-Eleven surveillance cameras. Plaintiffs did not object to nor did they dispute Fries' evidence as to distances, speed and time of Vos's charge to the police. Plaintiffs presented no evidence contrary to Fries. Plaintiffs argued that the video evidence should not have been admitted, and therefore disputed portions of the Fries expert report as lacking foundation. However, the district court ruled that the video evidence was admissible, a ruling Plaintiffs have not appealed.

issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* In addition, but not noted by the majority, is *Graham*'s instruction that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.*

The majority's first error is its statement that "the officers were not responding to the report of a crime." Slip Op. *10. This is clearly incorrect. The Officers responded to a report of Vos running around a 7-Eleven wielding scissors while screaming and harassing the customers and employees. It was apparent not long after Officer Kresge arrived that Vos had injured at least one person. Vos pantomimed to Kresge that he had a gun. At one point Vos grabbed a 7-Eleven employee and called him a hostage. At the least, under California law Vos likely could have been charged with assault with a deadly weapon,[5]

---

[5] *See* California Penal Code (CPC) § 245 (punishing a person "who commits an assault upon the person of another with a deadly weapon or instrument other than a firearm. . .). *See also* Slip Op. at *5 ("The clerks said that Vos had armed himself with scissors and one employee had been cut on the hand. . .").

false imprisonment,[6] criminal threats,[7] and disturbing the peace.[8, 9]

___

[6] "The three elements of felony false imprisonment in California are: (1) a person intentionally and unlawfully restrained, confined, or detained another person, compelling him to stay or go somewhere; (2) that other person did not consent; and (3) the restraint, confinement, or detention was accomplished by violence or menace." *Turijan v. Holder*, 744 F.3d 617, 621 (9th Cir. 2014). *See also* Slip Op. at *5 ("At one point, Vos grabbed and immediately released a 7-Eleven employee, yelling "I've got a hostage.")

[7] *See* CPC § 422 (punishing any person who "willfully threatens to commit a crime which will result in death or great bodily injury to another person.")

[8] *See* CPC § 415 (punishing any person who "unlawfully fights in a public place or challenges another person in a public place to fight" and who "uses offensive words in a public place which are inherently likely to provoke an immediate violent reaction."). *See also* Slip Op. at *5 ("Vos became agitated; he ran around the store shouting things like "[k]ill me already, dog,'. . . Vos ran around the store cursing at people.")

[9] The majority states that "the police initially were called in response to Vos's erratic behavior. When Officer Kresge arrived, he learned that one store clerk had been cut while trying to disarm Vos before authorities arrived, and he watched as Vos yelled, simulated having a handgun, and shut himself in the back room. Taking the facts in the light most favorable to the Parents, which we are required to do at this stage, *see Mattos v. Agarano*, 661 F.3d 433, 449 (9th Cir. 2011), it is not clear that the "crime at issue" in this case was one of the severe crimes the dissent identifies." Slip. Op. at *11. The majority's statement is perplexing. As the majority recognizes, it is undisputed that Vos used a weapon to injure a store employee, grabbed a 7-Eleven employee and declared that he had a hostage, and pretended to have a gun. There is no "inference" in the Parents' favor which can change these undisputed facts. As a result, prior to Vos's charge at the officers, he could have been charged with a number of *severe* crimes, including assault with a deadly weapon,

But more important is the majority's error in its analysis of the "most important [*Graham*] factor," *Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014), the immediacy of the threat posed by the decedent to the officers. The majority says that "[c]onstruing the facts as they are presented by the Parents and depicted in the video footage, a reasonable jury could conclude that Vos did not pose an immediate threat such that the use of deadly force was warranted." Slip Op. at *12. Again, I respectfully disagree.

What the majority ignores is the following undisputed fact: the police were presented with a mere two seconds in which to decide to deploy deadly force. Vos had secreted himself into a back room. The officers had just set up a means of communication when Vos suddenly reappeared and charged. In the mere seconds which passed, the officers warned Vos, and ordered him to drop his weapon. Instead, he ran at them at full speed with a weapon "uplifted." *Brown*, 256 U.S. at 343. As we see on the video, he charged full speed, directly at the officers. There is no factual dispute.

Yes, the officers had a "tactical advantage" as the majority describes. In a fight between Vos and the eight officers, the officers would undoubtedly have come out on top. But at what cost? It is reasonable for an officer, with only seconds to react, to conclude that the person wielding what looks like a knife and charging at him and his fellows would do serious harm to at least one of them.[10] It is all the

---

making Vos a "dangerous armed felon threatening immediate violence." *Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001).

[10] Again, the reader can see for him or herself by viewing the video of the shooting. *See* fn 3 ante.

more reasonable when those officers know that the person wielding the weapon has already stabbed somebody with it and heard a police officer yell "Shoot him!" To hold otherwise is to ignore the Supreme Court's instruction to remember that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396.

To find that the officers' response to the threat they faced was reasonable is not only logical, but is also compelled by our precedent. While the majority attempts to distinguish *Lal v. California*, 746 F.3d 1112 (2014), its arguments are unpersuasive. As the majority notes, *Lal* involved the police response to a disturbed individual who wished to commit "suicide by cop." *Lal*, 746 F.3d at 1117.[11] Lal had engaged police in a forty-five minute chase until finally pulling to the side of the road. Lal picked up a few rocks and threw them at the officers' car. Lal then picked up a "football sized rock," held it above his head, and advanced on the officers slowly. The officers instructed him to put the rock down. He did not, and he continued his advance. The officers shot him. A panel of our court ruled that the officers' actions were reasonable, and affirmed a grant of summary judgment in defendants' favor.

*Lal* is a closer case than this one. In *Lal*, the officers likely could have retreated to a position far enough away that Lal would have been unable to reach them with the rock. Lal

---

[11] A desire here expressed by Vos. *See* Slip Op. at *5 ("Vos became agitated; he ran around the store shouting things like 'Kill me already, dog.'")

advanced on the officers slowly, and there is no indication that he had any other means of harming the officers than the large rock he held above his head. The slow advance meant that the officers likely had more than two seconds in which to decide on the best course of action as Lal approached. Nevertheless, we made clear that "even assuming that it might have been possible for the officers to have given Lal a wider berth…there is no requirement that such an alternative be explored." *Lal*, 746 F.3d at 1118. *See also Billington v. Smith,* 292 F.3d 1177, 1188 (9th Cir. 2002) ("[P]olice officers need not avail themselves of the least intrusive means of responding and need only act within that range of conduct we identify as reasonable.") (citing *Scott v. Henrich*, 39 F.3d 912 (9th Cir. 1994)) (internal quotations omitted).

So too here. It is possible that other means could have brought down Vos without this tragic loss of life. But a reasonable officer could have believed that the alternate means would not have done the job without the risk that Vos stab one of them. The officers had two seconds to make these calculations before deciding to deploy force to stop the charging man.

Neither should this case turn on Vos's mental illness. While we may consider whether a person is emotionally disturbed in determining what level of force is reasonable, we have never ruled that police are obligated to put themselves in danger so long as the person threatening them is mentally ill. Such a conclusion would be illogical – especially given the admonition in *Bryan v. MacPherson*, 630 F.3d 805, 829 (9th Cir. 2010), quoted by the majority, that we will not "create two tracks of excessive force analysis, one for the mentally ill and one for serious criminals."

But that is exactly what the majority does here.

In *Deorle v. Rutherford*, 272 F.3d 1272, 1282-83 (9th Cir. 2001), we made a common-sense observation that a person who is emotionally disturbed may respond differently to police intervention than a person who is not emotionally disturbed. We noted that "[t]he problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense." *Rutherford*, 272 F.3d at 1282-83. We noted that in some cases, confronting a mentally ill individual with force "may…exacerbate the situation," and that "where feasible" officers who are trained to deal with mentally unbalanced persons should be deployed. *Id* at 1283. Bearing that in mind, the *Rutherford* court stated that "[e]ven when an emotionally disturbed individual is acting out and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual." *Id*. Here, Vos had already committed a "serious crime against others": he had stabbed a 7-Eleven employee. *See* CPC § 245 (prohibiting assault with a deadly weapon). In the next sentence, the *Rutherford* panel made clear that "[w]e do not adopt a per se rule establishing two different classifications of suspects: mentally disabled persons and serious criminals. Instead, we emphasize that where it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under *Graham*, the reasonableness of the force employed." *Id*.

*Rutherford* stands for a fairly common-sense and non-controversial result: a mentally disturbed person may respond differently to police intervention than does a person who is not mentally disturbed. Officers should bear this in mind when going about their duties.

But nowhere in *Rutherford*, or in any other case, have we found that an officer's interest in using deadly force is diminished when his life is threatened by a mentally disturbed person. The danger to the officer is not lessened with the realization that the person who is trying to kill him is mentally ill. Indeed, it may be increased, as in some circumstances a mentally ill individual in the midst of a psychotic break will not respond to reason, or to anything other than force.

But the majority instead creates a *per se* rule that in *all* circumstances the governmental interest in deadly force is diminished where the subject is mentally ill. While in *some* circumstances that may be true, in circumstances such as our case – where a mentally ill person charged at officers while wielding a metal weapon above his head – it is not. To hold otherwise would be to render meaningless the language in *Bryan* that we will not "create two tracks of excessive force analysis, one for the mentally ill and one for serious criminals." *Bryan*, 630 F.3d at 829. The majority states "the fact that Vos was acting out and had invited the officers to use deadly force on him is sufficient under our precedent for a reasonable jury to conclude that the government's interest in using deadly force on Vos was diminished." Slip Op. at *17. By the majority's logic, so long as an extremely dangerous person "acts out" or otherwise evinces mental illness, an officer's interest in self-defense is somehow diminished. The majority's position is simply untenable either as a matter of precedent or logic. Our precedent: in

*Lal*, we noted that Lal had stated that he wished "suicide by cop." *Lal*, 746 F.3d at 1117. In logic: whether the person who charges the officer does so out of a base desire to kill, or does so because, in the midst of a psychotic episode, he thinks the officer is a monster or a ghost, the danger to the officer is the same. The officer's interest in protecting his own life and the lives of his fellows is therefore the same as well.

Because I think the officers reacted reasonably to the threat they faced, I respectfully dissent in part and would affirm the decision of the district court.